DENTON v. HOLBERT. (No. 5582.)*

(Court of Civil Appeals of Texas. San Antonio. Feb. 16, 1916. On Motion for Rehearing, March 15, 1916.)

1. BROKERS ☞86(3) — CONTRACTS—COMPENSATION—ACTION.

In an action for compensation claimed by a real estate broker, evidence *held* to warrant a finding that the broker substantially performed his agreement.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 117; Dec. Dig. ☞86(3).]

2. BROKERS ☞48 — COMPENSATION — RIGHT TO.

Where a landowner, who was disposing of a large tract in small parcels, availed himself of contracts procured by plaintiff broker and did not cancel the broker's contract for nonperformance, he cannot defeat recovery of commissions on the ground that the broker did not comply with all terms of the contract.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 65; Dec. Dig. ☞48.]

3. EVIDENCE ☞460(2) — PAROL EVIDENCE — VARYING WRITTEN CONTRACT.

In an action for compensation due under a broker's contract which prohibited plaintiff from selling lands in the territory of any other agent but did not specify plaintiff's territory, parol evidence as to plaintiff's territory is admissible.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2116, 2124; Dec. Dig. ☞460(2).]

4. BROKERS ☞65(1) — COMPENSATION — DEFENSES.

Where defendant, who was disposing of a large tract of land located in Texas, admitted that he made no objections to plaintiff broker's handling other Texas lands, the broker's right to compensation for sales made cannot be defeated on that ground.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 48; Dec. Dig. ☞65(1).]

5. BROKERS ☞86(4) — COMPENSATION — ACTIONS—EVIDENCE.

In an action by a broker for commissions for sales effected through subagents, evidence *held* to show that the sales were not made by defendant directly through the subagents, but that he recognized such agents as being agents for the broker.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 117; Dec. Dig. ☞86(4).]

6. BROKERS ☞55(1)—COMPENSATION—RIGHT TO—ESTOPPEL.

Where a broker employed to sell lands in Arizona carried on a selling campaign in person for over a year and then turned the matter over to subagents, the broker is not estopped to claim compensation; the owner after objections acquiescing.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 82–84; Dec. Dig. ☞55(1).]

7. BROKERS ☞86(2)—COMPENSATION—RIGHT TO.

In a suit for compensation for sales of land for defendant, evidence *held* not to show that defendant discharged the broker or his subagents, but that defendant recognized the continuing agency of such persons.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 117, 119; Dec. Dig. ☞86(2).]

8. BROKERS ☞86(2) — COMPENSATION — ACTIONS—EVIDENCE.

In an action by a broker for compensation for sales of land effected through subagents, evidence *held* insufficient to show that the original contract was terminated before the sales were made.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 117, 119; Dec. Dig. ☞86(2).]

Appeal from District Court, Bexar County; S. G. Tayloe, Judge.

Action by J. V. Holbert against G. Denton. From a judgment for plaintiff, defendant appeals. Affirmed.

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Application for writ of error pending in Supreme Court.

R. E. Hannay, Jr., and R. P. Ingrum, both of San Antonio, for appellant. Ryan, Matlock & Reed and Butler L. Knight, all of San Antonio, for appellee.

MOURSUND, J. This is a suit by J. V. Holbert against G. Denton, upon a written contract, to recover commissions for the sale of lands belonging to Denton situated in Dimmit county, Tex., the amount sued for being $1,360 and upon a trial before the court judgment was rendered for the full amount sued for. The contract appears in the findings of fact filed by the trial court, as follows:

"(1) That heretofore, to wit, on or about the 15th day of October, 1908, the defendant was the owner of and offering for sale about 32,000 acres of land situated in Dimmit county, Tex., and was himself and through agents appointed by him and through subagents selling same in the name of Denton Colony Company.

"(2) Said land had been subdivided into about 2,543 tracts, most of which were in size 10 acres each, but certain tracts contained more than 10 acres.

"(3) A proposed town site was laid off on said land by which arrangement there were two town lots for each tract of land.

"(4) Much of said land was sold through agents of defendant and through subagents of said agents on written applications procured from intending purchasers, whereby each purchaser, upon the payment of a uniform price of $200 or $210 on terms, $10 cash and 20 notes payable monthly, per share, acquired a right to purchase one farm tract with its two accompanying proposed town lots on said land. No particular tract of land or lots were sold to any particular purchaser, but it was understood between the parties that, after sufficient shares had been sold to cover all of said land, then said land would be distributed to the several purchasers.

"(5) All of said shares were sold under the above plan.

"(6) The customary plan of selling was for the purchaser to pay $10 down and $10 per month until the sum of $210 had been paid for each share so purchased. It also provided in case purchaser made default in his payments the contract of sale might be canceled, and quite a number of persons did make default in their purchase contracts, and on account of which the defendant canceled said contracts and resold, or caused to be resold, said shares to other parties, many of which were sold after the distribution of part of said land which was about September 20, 1910.

"(7) Plaintiff, on or about October 15, 1908, resided in the state of California, and engaged in the real estate business at Bakersfield; and while residing at said Bakersfield, as a result of correspondence, plaintiff made a written contract with defendant concerning the sale of said Dimmit county land, which was in words and figures, as follows:

" 'Selling Agent's Contract.

" 'In accepting employment as sales agent for the Denton Colony Company, in Dimmit county, Texas, according to plan of partition I specially agree:

" 'First. That I will vigorously push the sales as per said plan, both personally and through such subagents, if any, to be paid by me upon such basis as may be agreed upon between us, but all of the sales shall be made in my name as agent, and not in the name of the subagent.

" 'Second. That all moneys and applications, to purchase lots and farms collected or received by me, or any of my subagents, other than the five dollars cash payment which I am entitled to retain as a part of my compensation, shall be trust funds, and myself or any of my subagents, receiving such moneys, or applications to purchase, shall and will merely act as trustee or bailee for the purchaser, as well as the said Denton Colony Company.

" 'Third. That all applications to purchase, and payments on applications, shall be forwarded to the Denton Colony Company, San Antonio, Texas, in due course of mail on the day received by me or any of my subagents, and failure so to do shall be a breach of said trust next above specified.

" 'Fourth. I agree to receive my commission and compensation as follows, viz., $5.00 cash to be collected from applicant and retained when application is taken; $5.00 to be paid me by the said Denton Colony Company when they have received payment of the first note; and $5.00 to be paid me by the said Denton Colony Company when they receive payment of the second note; $5.00 when they receive payment of third note, and $5.00 when they receive payment of the fourth note.

" 'Fifth. In the event of an oversale of the lots and farms, upon notice of such fact, I agree to immediately return to the respective applicants the $5.00 collected by me, and return any applications that I or my subagents may have in hand or in transit as to all sales made or money collected by me or by my subagents after all lots and farms have been sold.

" 'Sixth. No commissions are to be paid to me on any sale except such commissions as are collected from the purchasers in the manner stated in the fourth clause hereof.

" 'Seventh. Should I be negligent, dilatory or unsatisfactory in my services, the said Denton Colony Company, or any one of them is authorized, or the general state agent who appoints me shall have the right to immediately terminate this contract.

" 'Eighth. I also agree that I will not sell any lots and farms in another agent's territory, it being understood and agreed in advance that no agent will be allowed any commission for applications taken from residents of another agent's territory, except in cases of sales to nonresidents of the state and sales to traveling men.

" 'Ninth. I agree that I will not publish an advertisement (except extracts from owner's printed literature) and that if I desire to have any other advertisement printed, that I will first submit the copy through owner's San Antonio office, to owner's attorney, and receive owner's approval through his attorney, before the advertisement is printed; and further agree that any violation of this rule discharges me and forfeits to owner all commissions on business done which will thereafter accrue to me.'

"(8) It was further understood and agreed between plaintiff and defendant by correspondence that the territory assigned plaintiff under said contract was the state or territory of Arizona; and the plaintiff soon thereafter went to said territory and remained there for about one year, going from place to place in selling and attempting to sell shares in defendant's land plan, and in soliciting and appointing subagents to sell the same, and among other subagents so appointed by plaintiff were J. H. Hudson and V. H. Melick, of Williams, Ariz., under an arrangement with the plaintiff whereby said subagents were to receive $5 for each share sold by or through them, and there was an understanding or agreement between plaintiff and defendant and said subagents that said subagents should report any and all applications for the purchase of said shares of land directly to the defendant, and that the defendant should remit to them $5, or said subagents might collect and retain $5 on each application when taken, per share, so sold as said subagent's commission or compensation for making such sale, and the remaining $20 was to be paid by defendant to plaintiff.

"(9) This appointment by plaintiff of said sub-

agents was never revoked, and all the land sold by them, to wit, about 161 shares or applications, were sold by said Hudson & Melick under the arrangement first entered into and said Hudson & Melick received from defendant the compensation of $5 per share for each of said shares so sold; and the defendant reported and paid unto plaintiff the sum of $20 per share on 93 shares of said shares so sold, being the first 93 shares so sold by said Hudson & Melick as subagents of plaintiff. Defendant did not report to plaintiff the sales of the remaining 68 shares so sold by plaintiff by and through his subagents said Hudson & Melick, and has not paid plaintiff any compensation or commission therefor, on each of which plaintiff was entitled to $20 from defendant, according to said contracts between said parties thereto and said subagents' contract with plaintiff which was accepted and ratified by defendant, and the commission due plaintiff from defendant on sales made by said subagents is $1,360, and plaintiff is entitled to same with interest thereon at the rate of 8 per cent. per annum from January 31, 1912.

"(10) I further find that plaintiff substantially complied with the obligations of his contract with defendant and that his contract with defendant was never canceled or revoked.

"(11) I further find that defendant availed himself of the labor and benefits of plaintiff's said subagents in accepting the contracts, and the benefits thereunder, for sale of said 68 shares of defendant's land, and did not pay plaintiff the agreed compensation of $20 per share thereon."

[1, 2] The court concluded that as the defendant availed himself of plaintiff's subagents in accepting the contracts for the sale of said 68 shares, and did not pay plaintiff the agreed compensation of $20 per share thereon, plaintiff was entitled to recover $1,360 with interest thereon from January 31, 1912, at the rate of 8 per cent. per annum.

Appellant contends that the evidence shows a flagrant failure on the part of plaintiff to perform his contract, in that he failed to return to Arizona and push the sales of defendant's land in person, and in fact was absent from Arizona during all the time when the contracts were made upon which he bases his claim for commissions. This attack upon the court's finding that Holbert substantially complied with his contract cannot be sustained. The facts set out in the eighth finding of fact are undisputed and are referred to in this connection. It appears that, when Holbert came to San Antonio with Melick, he wanted to remain in San Antonio and intrust the further work in Arizona to subagents, and especially to Hudson & Melick. Denton wanted him to go back to Arizona, but did not insist upon it, nor cancel the contract, and, in fact, if he had the right to demand that Holbert should in person solicit contracts in Arizona, he waived such right, and permitted Holbert to fulfill his obligations through subagents. In this connection, the evidence warrants a finding that the contract made by Holbert with Hudson & Melick was signed in Denton's office and a copy filed with Denton. Denton recognized that Holbert was performing his contract, and availed himself of the fruits of the labor of the subagents, treating them throughout as subagents. This is shown by the fact that he paid them only $5 on each contract mentioned in plaintiff's petition which was the amount due them under their contract with Holbert, and by the further fact that he does not even contend that he ever notified such subagents that any change had taken place such as would entitle them to represent him directly. Denton paid Holbert his commission on 93 contracts sent in by Hudson & Melick, thus showing conclusively that he regarded the contract as being in full force and effect, and the testimony of Holbert and Sawyer supports the court's finding that the contract between Holbert and Denton was never canceled. Holbert testified that Denton told him that he (Holbert) and his subagents had sold over 400 contracts. This was a remarkable performance, and it appears that Holbert won a prize awarded by Denton for efficiency in selling contracts. It appears that Denton considered that his contract with Holbert did not confer the exclusive agency for Arizona, and he sent one A. G. Gnatz to Arizona; but, although he was in Arizona about two months, he failed to sell a single contract. The court was justified in finding that Holbert substantially complied with his contract; but even if he had not done so, as Denton elected not to avail himself of the provision authorizing him to cancel for certain reasons, and received the benefits accruing from the efforts of Holbert's subagents, he should not now be permitted to say that grounds existed upon which he would have been authorized to cancel the contract. The first assignment is overruled.

[3] The second and third assignments relate to the admission of testimony of Holbert with regard to the correspondence leading up to the making of the written contract. This testimony was to the effect that in such correspondence it was stated and agreed that Holbert should have the general and exclusive agency for the sale of lands for Denton in the state of Arizona. The contract afterwards drawn fails to show in what territory Holbert was to exercise his functions as selling agent, but it does prohibit him from selling in another agent's territory except to nonresidents of the state or to traveling men. The territory in which Holbert was to operate is not described in the contract, and there can be no valid objection to permitting Holbert to show what territory his contract applied to, and that is the only fact found by the court upon said testimony. Abbott's Trial Evidence, p. 361; Ascarete v. Pfaff, 34 Tex. Civ. App. 375, 78 S. W. 974; Kirk v. Brazos County, 73 Tex. 56, 11 S. W. 143. We do not understand that the court's judgment was predicated upon the theory that Holbert had the exclusive agency for Arizona. Nothing is said in his findings of fact with regard thereto, and Denton could not have been injured by admitting testimony to the effect that Holbert was to have the exclusive agency. We therefore deem it unnecessary to

determine whether such evidence was admissible upon the theory that it showed a contract or agreement which induced the execution of the written contract. The assignments are overruled.

[4] Appellant also contends that Holbert abandoned the contract and engaged in work under an employment wholly antagonistic to the business of defendant, and therefore his contract was annulled prior to the sales by Hudson & Melick upon which the suit is based. It appears that in January, 1910, Holbert entered into a contract to sell for E. P. Simmons a section of land in Dimmit county under a plan similar to the one used by Denton. The evidence fails to show that he tried to sell any of this land in Arizona, and it appears from Denton's testimony that he had no objections to Holbert's handling other deals in Texas. The fourth assignment is overruled.

[5] Appellant contends that all sales for which commissions are claimed were made direct and through the office of the defendant and were not brought about by any efforts on the part of plaintiff. As is fully shown in discussing the first assignment of error, there is no merit in the foregoing contention, for all sales were made by Holbert's subagents, recognized and treated as such by Denton, and without ever attempting to employ them to sell in any other capacity than as Holbert's subagents. Assignments 5 and 6 are overruled.

[6] It is further contended that Holbert's conduct was such as to estop him from claiming commissions, in that he declined to return to Arizona, engaged in the sale of other lands, and failed to notify Denton he expected commissions. What we have heretofore said disposes of this contention adversely to appellant. There is no element of estoppel in this transaction. Assignment No. 7 is overruled.

There is no merit in the eighth and ninth assignments. Holbert did spend his money and in person prosecute sales vigorously for a year, and afterwards his subagents paid such expenses as they incurred. Defendant incurred no expense in connection with the sale of the 161 contracts reported by Hudson & Melick, except the payment of commissions as contracted. It is plainly apparent from his own testimony that he regarded it as his duty to send out literature at his expense to such persons as his agents named.

[7] It is further contended that the court erred in rendering judgment for the sales made after the latter part of January, 1910, appellant's theory being that at said time the deal was closed and all agents notified and discharged, and the greater portion of the 68 sales were made afterwards, and appellee should not be awarded commission on such sales. Appellant contended that he discharged Holbert as an agent, in so far as the Arizona contract was concerned, in November, 1909; but the court's finding against such contention is amply supported by the testimony. Appellant also testified that he closed up his deal and discharged his agents generally in the latter part of January. Sawyer, Denton's bookkeeper, testified that Denton sent out a telegram to his agents stating that all lots had been sold, or that nearly all had been sold; that in fact they were not all sold, and the telegram was for the purpose of bringing in a rush lot of sales. Holbert testified that Denton never discharged him, and that he never heard of being discharged until the trial of the case. Denton's books show that several sales were made by Hudson & Melick on February 1, 1910, one in May, 1910, and quite a number in June and July, 1910. No change was made in the method of keeping the books at the end of January. Denton made reports to Holbert up to May 7, 1910, of sales by Hudson & Melick and of payments made by purchasers. The parties, in speaking of the close of the sales of Denton Colony lands, appear sometimes to have in view the telegram sent in January to the agents, and sometimes the distribution of the lands which occurred about September 29, 1910. It is very plain that, regardless of what may have been the case as to other agents, Denton went right on with the contract with Holbert, availing himself of the ability of Holbert's subagents to sell contracts, and reaping the benefits thereof, treating them as subagents and paying them as subagents. It is apparent that, when he "discharged his agents generally," he omitted to discharge Holbert and Holbert's subagents, and the court did not err in holding him liable for commissions on all sales made by them. Assignment No. 10 is overruled.

[8] The eleventh assignment presents the contention that Holbert should not recover for any sales made after November 20, 1909, the theory being that a new contract was then made between Holbert and Denton whereby Holbert was authorized to sell in Texas, and therefore he should not recover under the first contract. It appears that Denton recognized the first contract as remaining in full force and effect, reporting to Holbert many sales made after November 20, 1909, and playing his commissions thereon. The assignment is overruled.

Assignments 12 to 16, inclusive, constitute attacks upon the findings of fact of the trial court, while assignments 17 and 18 constitute attacks upon the conclusion of law filed by the trial court. All of these assignments are overruled, and the findings of fact filed by the trial court are adopted by us. The twentieth, in which the contention is made that Holbert was not the procuring cause of the sales for which he seeks to collect commissions, is also overruled.

The twenty-first and twenty-second assignments are also overruled. Our views with

regard to the contentions made are sufficiently disclosed in the discussions relating to other assignments.

Assignments 23 to 35, inclusive, complain of the failure of the court to make additional findings of fact pursuant to request of appellant. There being an agreed statement of facts in the record, and it being our opinion that appellant has been enabled to present fully all of his contentions, and that no injury has been sustained by reason of the failure of the court to find in answer to the questions asked, we overrule all of such assignments.

The judgment is affirmed.

### On Motion for Rehearing.

The statement in our opinion that "it appears that when Holbert came to San Antonio with Melick he wanted to remain in San Antonio and intrust the further work in Arizona to subagents, and especially to Hudson & Melick," is vigorously attacked as unsupported by the evidence. We will briefly state some of the evidence on which we based our statement. Denton testified:

"It is a fact that, just as soon as Mr. Holbert told me he wanted to stay here and he could handle his business as well by subagents, I told him that if he did not go back we were going to discharge him."

Holbert testified to discussing the matter with Denton, and admitted that Denton thought he could do better by going back, but testified positively that Denton did not discharge him verbally or by letter then or later; that he never heard of being discharged until the trial of the case. Holbert testified his health was bad, and that he told Denton he "could manage Arizona here in San Antonio." He testified further:

"He thought I could do better going back, but, after finding Mr. Melick as agent, it proved I was doing better or as good as if I had went back myself, from Mr. Melick's number of contracts he sent down here."

He also testified that he stayed in San Antonio where Denton put him to work and sold shares "after Melick went back and took charge at Williams, Ariz." While it appears that he had other subagents in Arizona, it seems, from the letters he wrote Denton before going to San Antonio with Melick, that most of his hopes were centered in the prospect of selling shares in the vicinity of Williams, and that having formed a club there, if Melick's report on the land proved favorable, he expected sales could be made of from 100 to 200 shares. We think the testimony fully sustains the statement made by us. The evidence supports a finding that while Denton was of the opinion, especially at first, that Holbert should return to Arizona, he did not insist upon it or discharge him, but was satisfied with the way in which sales were being made by Holbert's subagents.

Appellant also attacks the statement that Denton recognized that Holbert was performing his contract and availed himself of the fruits of the labors of the subagents, treating them throughout as subagents. It is true that Denton's books had two columns on each page, showing the name of the general agent and the name of the selling agent. Holbert's name appeared under the heading "General Agent" "up to a short time before the 20th of November, 1909," and thereafter did not appear, while the name Hudson & Melick appears throughout under the heading of "Selling Agent." There was no explanation offered as to why the name of Holbert was left off, and no explanation offered of the circumstance that this occurred a short time before November 20th, the date Denton claims to have discharged Holbert as agent for Arizona. Denton did not keep the books, and Sawyer, who did keep them, merely testified that Holbert's name appeared first as selling agent and that he scratched it out and wrote in the name of Hudson & Melick, and then wrote Holbert's name in the other column; that he did this when Holbert reported that he had certain people assisting him in Arizona who were entitled to commissions. Appellant attaches undue weight to the failure to keep on writing Holbert's name under the heading of general agent. This was primarily Holbert's account, and, while it was necessary to state the name of each selling agent who sold a share, they were all agents of Holbert, and it was unnecessary to keep on writing his name in the other column. It is not a conclusive circumstance showing that Hudson & Melick were no longer treated as subagents. The books, according to the statement of facts, show that on each of the sales mentioned therein made by Hudson & Melick they received $5, the amount they were to receive as subagents. There is no pretense that they were ever informed that the contract under which they were operating had been canceled. Denton testified: "I did not have a contract with them at any time, I wrote them." In his motion for rehearing he argues we should infer from the statement that he wrote Hudson & Melick that he meant he had no formal written contract, and that, to show he did have some different arrangement with them upon some kind of a basis, he stated that for the last share they sold he paid them $25. Melick testified they received $5 for each sale made, but his attention was not directed to the particular sale mentioned by Denton.

Appellant asks too much when he expects courts to infer from the fact that he wrote letters that such letters contained statements informing Hudson & Melick that the contract under which they were operating was at an end, and also when he contends that a contract should be inferred from the fact that on the last sale made by them he paid them $25. This sale was made on December 26, 1911, to a person whose name does not appear in the list of contracts for which plaintiff seeks to receive commission, and

whose name we can reasonably find does not appear upon the books, for the statement of facts contains the statement that Hudson & Melick were paid $5 per share for each one appearing in the books. In addition, it may be said that appellant's explanation concerning the payment of this $25 does not justify any inference of a different contract, for he testified he simply offered it and they "accepted it with no particular reason except to make the sale." Surely, if appellant had informed Hudson & Melick that he had discharged Holbert, and had entered into a contract with them, he would have been only too glad to have so testified, and Melick would also have so stated, for his testimony does not evidence any disposition to assist Holbert. The fact that Denton, for some unexplained reason, considered $25 adequate compensation for making the last sale, tends to support the finding that he treated Hudson & Melick as subagents with regard to all sales for which he allowed them only $5 and for which Holbert sought to recover commissions. Appellant admits that up to November 20, 1909, he recognized Holbert's agency, and 93 sales were made by Hudson & Melick upon which he admitted liability to Holbert. The other 68 were made in exactly the same way, through the same parties, without any notice to them that any change had taken place, and he paid only a subagent's commission. We think evidence supports the statement made in our former opinion.

We find that we were in error in stating that Denton reported to Holbert many sales made after November 20, 1909, and paid his commissions therein. This statement was made by reason of the fact that so many names included in the reports to Holbert appear in the list of sales for which commission is sought to be recovered. We conclude that said parties must have purchased contracts before November 20, 1909, in addition to those for which commission is sought to be recovered. Still we do not feel authorized to hold that the evidence conclusively shows a new contract between Holbert and Denton on or about November 20, 1909, whereby Holbert was authorized to sell in Texas but discharged from Arizona. There is a direct conflict between the testimony of Holbert and Denton on this issue, and the court may well have concluded that it was highly improbable that Holbert would prefer to stay in San Antonio when required to go back to Arizona or lose the business which the evidence shows paid him for the preceding three weeks from $1,420 to $1,820. His testimony was that 93 contracts were made after October 25th, while Denton testified 22 thereof were made prior to October 25th. It appears from Selby's testimony, introduced by defendant, that Selby, during the fall of 1909 and first part of 1910, talked to Holbert three or four times a week, a part of the time; that Holbert told him he was selling land for Simmons, and he understood from Holbert that he was the Arizona agent for Denton Colony. As Holbert's contract with Simmons is dated January 31, 1910, the natural inference is that Holbert considered himself the Arizona agent for Denton Colony after January 31, 1910. Denton testified that when he closed his sales in the latter part of January, 1910, he discharged most of his agents, but kept a few. The evidence supports a finding that he failed to discharge Holbert, for Holbert testified positively that he was not discharged. It appears, however, that on January 31, 1910, Holbert signed a contract with Simmons to sell section 14 upon a plan very similar to that used by the Denton Colony Company, and we were mistaken in saying that he did not try to sell any Simmons contracts in Arizona, for he admitted that he did, but the evidence fails to show when he tried to do so. It does not appear that he succeeded, and he did not try to get Hudson & Melick to sell same, but suggested to Melick that after he got through with the Denton Colony there was another opening in the Simmons land. It appears from Denton's testimony that, after the close of his sales in January, he forfeited several hundred purchases, and that many of those sold by Hudson & Melick were forfeited shares. Denton availed himself of Holbert's subagents to continue selling forfeited shares, without discharging Holbert. The contract with Simmons is dated January 31, 1910. Holbert went to Asherton and opened an office. On February 10, 1910, he wrote Denton concerning the sale of other lands for Denton, but did not mention in said letter that he was trying to sell a certain section of land. On February 14, 1910, Denton Colony Company answered the letter, approving what Holbert had done in his efforts to sell the Denton lands, and approving his arrangement with one Gregory, who apparently represented Denton, for commissions; also, promising to send him a blueprint showing the Denton Colony Annex, and some printed matter in connection therewith. This letter contains the following significant statement: "I hope you are getting along nicely and will soon close up that section of land you are handling. Mr. Farrington sends his kind regards."

No section of land had been mentioned in Holbert's letter, introduced in evidence by defendant. Had he written other letters not produced by defendant, or had Farrington who was jointly interested with Holbert in the Simmons contract informed Denton that Holbert had undertaken to sell section 14 for Simmons? In the next letter by Holbert to Denton, introduced by defendant, which is dated March 1, 1910, he mentions section 14, and speaks of selling some of it, and says he cannot tell how long it will take for him to close out. On March 16th, he again wrote Denton mentioning section 14 and telling what he had been doing, and stating that he is glad Denton is making arrangements with

his eight sections. The letter by Denton which called for the last statement was not introduced by Denton. On March 18th, Holbert again wrote Denton in reply to a letter not in evidence concerning sales by Holbert to certain San Antonio parties of Denton Colony shares concerning which there was a controversy as to commissions. On April 14, 1910, Holbert again mentions section 14. Denton testified he was familiar with the plan of sale used by Simmons; that, if Holbert was engaged in any other enterprise than his, he would not have permitted Holbert to work for him; that, while he was engaged in selling contracts in Bexar and Dimmit counties, he had no objections to his handling any other deal he wanted to. The evidence warrants a finding that Denton knew of and acquiesced in the employment of Holbert by Simmons and waived any right to claim a cancellation on the ground of antagonistic employment.

We therefore conclude that, even if the employment was shown to be inconsistent, Denton cannot evade liability on the theory of inconsistent employment, as is urged in the fourth assignment. Such employment, if not waived, could at the most be relied on only to deprive Holbert of compensation for sales made after January 31, 1910. Cotton v. Rand, 93 Tex. 23, 51 S. W. 838, 53 S. W. 343; Peacock v. Coltrane, 44 Tex. Civ. App. 533, 99 S. W. 107.

The motion for rehearing is overruled.